IN THE MATTER OF WILLIAM J. RAGGIO, DISTRICT
ATTORNEY OF WASHOE COUNTY, NEVADA.

No. 6142

July 13, 1971 487 P.2d 499

## O P I N I O N

*Per Curiam:*

The Board of Governors of the State Bar of Nevada has recommended that this court reprimand William J. Raggio for public statements made by him as the District Attorney of Washoe County, Nevada, concerning the opinion of this court in the celebrated case of Bean v. State, 86 Nev. 80, 465 P.2d 133 (1970). That opinion, for the second time, sustained a jury verdict finding Bean guilty of first degree murder. When the Bean case was first before this Court, Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965), we affirmed not only his conviction, but the penalty of death which the jury had decreed. Upon the second appeal, the death penalty thus imposed was set aside and the case remanded for another hearing limited to the issue of penalty alone. This difference in the result of the two appeals was believed by a majority of this court to be compelled by an intervening decision of the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510 (1968), since the doctrine of that case was directed to be applied to death penalty convictions previously entered.

The obligation of this court to follow and apply controlling decisions of the United States Supreme Court is written in our Nevada Constitution Article 1, Section 2, and that obligation must be discharged fearlessly and without regard to consequences.[1] Indeed, every citizen, including the District Attorney, is similarly bound. Were it otherwise, ours would be a government of men rather than a government of law. The controlling authority of law must be recognized if we are to endure as a nation. The courts are the symbolic representatives of law and must be allowed to do their duty.

Every licensed attorney knows that he belongs to a profession with inherited standards of propriety and honor which experience has shown necessary in a calling dedicated to the accomplishment of justice. He who would follow that calling must conform to those standards. The responsibility for the ultimate enforcement of those standards reposes in the courts since the government of the legal profession is a judicial function. Among other matters, these standards of propriety and honor require the lawyer to protect the rights of litigants in pending cases (SCR 199) and to uphold the respect due courts of justice (SCR 73, 204). Aside from this, simple regard for efficient and economical operation of our judicial system demands that all counsel refrain from needlessly creating possible impediments to obtaining a fair trial, with resulting litigation that delays rather than furthers the purpose of our courts. For this reason among others, Supreme Court Rule 199 prohibits all counsel, not just prosecutors, from causing the publication "of any material concerning a case on trial or any pending or anticipated litigation, calculated or which might reasonably be expected to interfere in any manner or to any degree with a fair trial in the courts or otherwise prejudice the due administration of justice."

One who is not a lawyer nor acquainted with the need for standards to govern members of the legal profession may tend to view a prosecutor's remarks about a pending case and the court's handling of that case to be an exercise of the right of free speech and, therefore, not subject to sanction. However, this is not true. The freedom to express oneself does not carry

---

[1]Art. 1, § 2: . . . "But the Paramount Allegiance of every citizen is due to the Federal Government in the exercise of all its constitutional powers as the same have been or may be defined by the Supreme Court of the United States."

implications that nullify the guarantees of impartial trials. The processing of a case by those charged with the responsibility is not to be diverted from established protections and placed in the primitive melee of passion and prejudice. Justice Frankfurter once wrote that "free speech is not so absolute or irrational a concept as to imply paralysis of the means for effective protection of all freedoms secured by the Bill of Rights." Nor does free speech give a lawyer the right to openly denigrate the court in the eyes of the public. In re Maestretti, 30 Nev. 187, 93 P. 1004 (1908); In re Breen, 30 Nev. 164, 93 P. 997 (1908). In the Breen case, supra, the Supreme Court's opinion was characterized as "reprehensible if the court knew what it was doing, pitiful if it did not." He was found guilty of contempt.

The remarks of the District Attorney in the matter before us were deemed by the Board of Governors to warrant reprimand. He characterized this court's opinion as "most shocking, certainly to this office, and I'm sure to anyone who has dealt with similar problems."; "[t]he Witherspoon decision has clearly no application to the facts of this case, and the court in the majority opinion has frankly gone to a great extent to do some semantical gymnastics to come up with a situation which resembles the Witherspoon situation; and I feel very strongly as I sit here today faced with the task of—almost insurmountable task of reacquiring witnesses after some six or seven years and retrying the case.[2] I feel that it's an example of judicial legislation at its very worst."; "[i]n my opinion this is the most shocking and outrageous decision in the history of the Supreme Court of this State. It's unexplainable, and in my opinion totally uncalled for." These statements were made by Mr. Raggio during a television interview which he arranged upon learning of the court's opinion. At that time he was prominently mentioned as a candidate for either governor or United States senator. Maximum dissemination was given his views. His initial comments were frequently repeated in the press and on television during the weeks and months to follow. The public was quick to respond. This court became the center of controversy. Essential public confidence in our system of administering justice may have been eroded.

The inner motivation which caused Mr. Raggio to speak out in such intemperate fashion is unknown to us and we shall not

---

[2]The penalty hearing has since been held. The witnesses were available. The new jury assessed the penalty of death.

indulge in presumptions or inferences adverse to him. We are never surprised when persons, not intimately involved with the administration of justice, speak out in anger or frustration about our work and the manner in which we perform it, and shall protect their right to so express themselves. A member of the bar, however, stands in a different position by reason of his oath of office and the standards of conduct which he is sworn to uphold. Conformity with those standards has proven essential to the administration of justice in our courts. Mr. Raggio offended them, and, as recommended by the Board of Governors, we reprimand him therefor.